Iowa Soya Company, a limited partnership, appellant, v. Davis Elevator Company, Inc., appellee.

No. 47549.

(Reported in 41 N.W. 2d 51)

February 7, 1950.

E. B. Stillman, of Clear Lake, and Lehmann, Hurlburt, Hossfeld, Blanchard & Cless, of Des Moines, for appellant.

Lundy, Butler & Lundy, of Eldora, and Senneff & Buck, of Britt, for appellee.

MULRONEY, J.—On December 17, 1945, plaintiff, a soybean processing partnership, entered into a written contract with defendant, a grain elevator corporation, for the purchase by plaintiff of 100,000 bushels of soybeans during the harvest season of 1946. Paragraphs 2 and 3 of the contract stated:

"2. This contract is made expressly for the purpose of purchasing for deferred shipment a maximum of *100,000* bushels of the 1946 crop of soybeans in accordance with any applicable regulations set forth by Commodity Credit Corporation. To be first storable beans received.

"3. Upon presentation of warehouse receipts properly signed by the 'SELLER' showing beans in storage in the warehouse mentioned in the receipt, the 'BUYER' shall pay the 'SELLER' by draft through the Valley Savings Bank of Des Moines, Iowa, in accordance with the price schedule of soybeans which has been fixed at $2.04 per bushel to the grower for the No. 2 yellow grade at 14% moisture, plus the government stipulated handling charge to the elevator."

In paragraph 4 of the contract defendant-seller agreed to store the beans purchased under the contract for five months with an added charge for additional storage. Paragraph 5 of the contract provided the seller must keep the beans insured, and paragraphs 6 and 7 of the contract stated:

"6. The 'BUYER' further agrees to pay the difference between the final price which accrues to the 'SELLER' and the original support purchase price when the soybeans are received at 'BUYER'S' mills.

"7. The 'SELLER' agrees to sell to the 'BUYER' for deferred shipment, only such soybeans as will apparently keep in good condition and to load into cars the amount of bushels as designated by contracts of sale of soybeans for deferred shipment without further cost to the 'BUYER'."

In paragraph 8 provision is made for the handling of beans that go out of condition before plaintiff has given shipping instructions. Paragraph 9 provides all shipping instructions are to be furnished by the plaintiff-buyer, and paragraph 10 provides:

"10. The 'SELLER' agrees to guarantee grade and outturn weights on all soybeans sold to the 'BUYER' on the herein described deferred shipment plan. Any discrepancies in weight or grade from contract weights and grades are to be charged to the 'SELLER' by the 'BUYER' at the time soybeans are received at the 'BUYER's' mills."

The eleventh and last paragraph of the contract is a warranty that the producer of all soybeans sold under the contract has received not less than the support price established by the department of agriculture and that charges made to buyer are not in violation of governmental rules and regulations.

Plaintiff sued the defendant for damages for an alleged breach of the above contract. The petition alleged the due execution of the contract, and set forth a copy thereof. It alleged the defendant "purported to perform said contract" in that defendant had, between October 5, 1946 and November 8, 1946, issued to plaintiff ten warehouse receipts for a total of 100,000 bushels of soybeans. The petition went on to allege:

"That on the date of the contract, Exhibit A, and at all times thereafter until October 17, 1946, soybeans and their handling and storing were under O.P.A. ceiling, which combined ceiling for the harvest season of 1946 was the sum of $2.31 per bushel, and defendant, for the sales to plaintiff on October 5th, 9th, 12th, and 14th, drew on plaintiff through Valley Bank and Trust Company, Des Moines, Iowa, in amounts for 55,000 bushels at that price, and said drafts were honored and warehouse receipts delivered to plaintiff.

"On October 17, 1946, O.P.A. ceilings were removed, and thereafter plaintiff paid defendant for the remaining 45,000 bushels of soybeans under said contract at the market price of $3.06 per bushel, and drafts at that price were similarly honored and warehouse receipts issued to plaintiff.

"That notwithstanding the provision of Exhibit A that the soybeans to be sold plaintiff under said contract were 'to be first storable beans received' by defendant, and unbeknownst to plaintiff, defendant, prior to October 17, 1946, became the owner of and received 20,000 bushels of storable soybeans which under dates of October 5 and 7, 1946, it sold to persons other than plain-

tiff and which, had they been sold plaintiff, as provided in said contract, would have been sold at the then ceiling price of $2.31 per bushel.

"Plaintiff did not learn of the fact that defendant had acquired and sold said 20,000 bushels of soybeans prior to October 17, 1946, until after November 8, 1946, the date defendant purported to complete said contract.

"That had said 20,000 bushels of soybeans been sold plaintiff in accordance with said contract, plaintiff would have been obliged to pay defendant 75 cents a bushel less for said beans or an aggregate of Fifteen Thousand Dollars ($15,000.00)."

The prayer was for judgment for $15,000. Defendant answered admitting the contract and its issuance of warehouse receipts as alleged in the petition and the answer admitted the sale of 20,000 bushels of beans to persons other than plaintiff (shown to be General Mills) but alleged these beans were not storable beans within the meaning of the contract and not such beans as would keep in good condition. The answer denied that plaintiff suffered any loss by reason of the sale to others, and asserted in Paragraph 11:

"This defendant further shows that beans as known to the trade and under general custom are fungibles and the said Davis Elevator Company applied said warehouse receipts so issued to the plaintiff, to the first 100,000 bushels of storable beans so received by it and disposed of the 20,000 bushels of unstorables to other persons; so that the plaintiff received from the said Davis Elevator Company the first 100,000 bushels of storable beans purchased or received by said Davis Elevator Company after the making of the agreement sued upon in this case."

The case was tried to the court and the court made findings of fact and conclusions of law and rendered judgment in favor of defendant. Plaintiff appeals, asserting error in the admission of certain testimony, one of the twenty-two findings of fact, and four of the eight conclusions of law.

I. The first error asserted involves the construction of the contract. Plaintiff's entire case, as indicated by its petition, is bottomed on the proposition that the contract required defendant to issue to plaintiff warehouse receipts for the first hundred

thousand bushels of storable beans. Or, stated another way, plaintiff contends the defendant breached the obligations of the contract if it issued warehouse receipts to any other person *before* it had issued warehouse receipts to plaintiff totaling 100,000 bushels of storable beans. It is undisputed in the evidence that defendant actually did receive 165,000 bushels of the 1946 crop of which about 138,000 would be classed as storable. It is also undisputed, and in fact admitted by the pleadings, that plaintiff did receive warehouse receipts for 100,000 bushels of storable beans of the 1946 crop, and there is no question but that the beans ultimately delivered upon such receipts were of the kind, quality and grade provided in the contract.

Plaintiff's argument that defendant was required under the contract to deliver to it the first warehouse receipts representing 100,000 bushels is based on the language of paragraph 2: "This contract is made expressly for the purpose of purchasing a maximum of 100,000 bushels of the 1946 crop of soybeans * * * to be first storable beans received." Defendant argues this provision as to the "first storable beans received" was put in the contract to bind defendant to furnish plaintiff all beans it received up to the amount of 100,000 bushels. There is support for this interpretation found in plaintiff's testimony. Mr. Straight, a partner and general manager of plaintiff-company who executed the contract for plaintiff-corporation, stated:

"We were to have the first 100,000 storable beans * * *. Under the contract they were to furnish us the first 100,000 bushels of beans *and we wanted 100,000 bushels of beans*—no more and no less. We were figuring on what it would take to keep the plant operating." (Italics supplied.)

Of course plaintiff did not consider defendant obligated to segregate the first hundred thousand bushels of storable beans and deliver those exact beans in fulfillment of the contract. All the beans were for "delayed shipment" and both parties recognized they would be kept in storage by defendant for at least five months. Mr. Straight testified that beans were "fungible goods" and "all mixed up" so if more than 100,000 bushels of storable beans of the 1946 crop were received defendant was merely obligated to *furnish* plaintiff 100,000 bushels of those

beans. We cannot see how the clause "to be first storable beans received" has anything to do with the issuance of warehouse receipts. It is in the preamble or general-purpose clause of the contract where the parties announce in effect that the purpose of the contract is to give plaintiff a right to *purchase* a maximum of 100,000 bushels of beans. Defendant's obligation to sell 100,000 bushels of beans to plaintiff is not absolute. It depends on the number of bushels of beans defendant receives from the growers. But defendant is bound to sell the storable beans it receives up to the amount of 100,000 bushels. The manner in which the sale of beans will be accomplished is set forth in succeeding paragraphs of the contract.

The only provision in the contract which mentions warehouse receipts is paragraph 3 heretofore quoted. The trial court construed this clause as providing "that defendant might issue warehouse receipts for storable beans and assign them to plaintiff from time to time up to the amount of 100,000 bushels [but] the issue of same was optional with the defendant, the authority being permissive and for the convenience of the defendant." This seems to us to be a proper construction of the clause. Admittedly defendant could have waited until it had the full hundred thousand bushels of storable beans or until December when it had 138,000 bushels before issuing any warehouse receipts to plaintiff. The issuance of warehouse receipts from time to time as the beans came in to defendant's elevator was merely for defendant's convenience in financing its purchases from the bean growers. Mr. Straight testified that under the contract he expected the warehouse receipts would "be mailed in when the seller needed the money." As the contract states a number of times, the beans to be purchased thereunder were for "deferred shipment." So far as we can see, the only right given plaintiff with respect to warehouse receipts would be a right to demand that the warehouse receipts endorsed to it would represent 100,000 bushels of the mass of storable beans of the 1946 crop in defendant's elevator. Plaintiff was given no right to demand the issuance to it of warehouse receipts on any day or date. The issuance of the warehouse receipt on a certain date determined the price though this did not mean much before the

OPA ceiling was lifted. The parties admit this. Mr. Straight testified:

"We paid the price at the time the warehouse receipts were issued. After October 17 [when the price ceiling was lifted] we expected to pay $3.06 per bushel [the market price] on the balance of the 45,000 bushels."

There is no prohibition in the contract forbidding defendant from issuing warehouse receipts to anyone else. There is no provision in the contract that the warehouse receipts must be issued to plaintiff as the beans arrived at the elevator. This contract gives plaintiff rights to purchase, on defendant's terms as to time and price, up to 100,000 bushels of the 1946 bean crop he received, but defendant was not barred from serving other customers so long as sales to other customers did not prevent its performance of the maximum obligation under the contract with plaintiff.

Defendant, by surveying the bean crop in the vicinity, knew it would receive more than 100,000 bushels of beans of the 1946 crop. Defendant knew it could sell those surplus beans to others. And there is nothing in the contract prohibiting the sale of those beans on warehouse receipts. And there is nothing in the contract that prohibits the issuance of warehouse receipts to other customers before the issuance of warehouse receipts for 100,000 bushels to plaintiff. There is nothing to prevent defendant from determining its margin of safety and acting accordingly. The maximum obligation of its contract with plaintiff was to deliver warehouse receipts *at a time it, defendant, determined* for 100,000 bushels of the 1946 crop.

Under the foregoing construction plaintiff is stopped at the very threshold of its case. It failed to prove any breach of the contract. Plaintiff's right to purchase 100,000 bushels of the storable 1946 crop of soybeans (of the 138,000 bushels of storable beans defendant actually received) was recognized by defendant. Defendant performed as agreed by issuing warehouse receipts to plaintiff, at a time it determined. Plaintiff is in no position to complain of the time when warehouse receipts were issued to others as to beans over the quantity (100,000 bushels) to which plaintiff was entitled.

We have been unable to find any case where a court has had occasion to construe a similar contract. But the contract is an executory contract (55 C. J., Sales, sections 206 and 208) partaking of some features of requirement and output contracts. 46 Am. Jur., Sales, sections 158–160. The plaintiff was contracting to obtain its soybean requirements to operate its plant. As Mr. Straight said: "We were figuring on what it would take to keep the plant operating." The defendant was contracting to sell its output of beans up to the maximum amount of the contract or 100,000 bushels. For an excellent discussion of requirement and output contracts see In re United Cigar Stores Co., D. C. N. Y., 8 F. Supp. 243.

We are only concerned with the output feature of this contract. Under the true output contract where the seller contracts to sell the entire output of his plant or business to one purchaser, he so binds himself that he loses the right to sell to anyone else. In re United Cigar Stores Co., supra, and cases there cited. But here the clear and unambiguous meaning of the language used is that if the seller received more than 100,000 bushels of the 1946 crop it lost none of its rights to deal with its other customers as to the surplus. If it had been intended that all warehouse receipts must be delivered to plaintiff for 100,000 bushels before delivery of such receipts to other customers, the contract should have so provided. The provisions that left to the defendant control of the time of such delivery of warehouse receipts, and thereby the control of the price, gave defendant the opportunity for complete performance by delivering such receipts at any time, and plaintiff cannot predicate a claim of breach on the time when such receipts were issued to others. Plaintiff received exactly what it contracted for.

■ II. The trial court went further and held plaintiff did actually receive the first hundred thousand bushels of storable beans, in the sense that its warehouse receipts were fulfilled by delivering 100,000 bushels of storable beans, while those issued to General Mills on October 5 and 7 for 20,000 bushels were, by prior arrangement with General Mills, fulfilled by delivery of wet unstorable beans. Plaintiff challenges the trial court's finding of fact in this regard but we think it supported by the evidence. Mr. Arnold, the manager of defendant-company, testi-

fied that in September he made several efforts to get in touch with Mr. Straight, the manager of plaintiff-company, but was not able to contact him. On September 27, before any beans were harvested, he drove to Redfield with a Mr. Van Grundy and waited most of the day to see Mr. Straight to see what plaintiff was going to do about wet beans. When Mr. Straight could not be located he put the question to Mr. Ogg, Mr. Straight's son-in-law and a partner and sales manager in plaintiff's plant. Mr. Ogg told him they did not want any fourteen per cent beans; that their drier was not ready and they could not handle anything above fourteen per cent. After this trip Mr. Arnold took up the matter of wet beans with General Mills and talked with the manager of that company about selling a blend of wet and dry beans. General Mills had a drier they used on beans of fourteen per cent moisture or over. Thereafter on October 5 and 7, or a few days thereafter, defendant endorsed the warehouse receipts to General Mills for 20,000 bushels of beans, and the evidence is clear that the delivery under such receipts in December was of blended unstorable beans.

Plaintiff argues that at the time the warehouse receipts were issued to General Mills on October 5 and 7, there were no wet beans in defendant's elevator, and the warehouse receipts did not show they were for wet beans. This is true but defendant could make any arrangement it cared to about unstorable beans. The moisture content on the warehouse receipts is mostly for fixing the price—a price that is subject to discount and adjustment when delivery is made. Like the surplus over 100,000 bushels, the unstorable beans were not covered by the contract. The issuance of a warehouse receipt for delayed delivery of beans, which the issuer and acceptor agree will be fulfilled with wet unstorable beans to be later obtained, is no breach of this contract which only purports to cover storable beans.

Other errors are assigned, but the foregoing, to the effect that plaintiff failed to prove a breach of the contract, is determinative of plaintiff's case. The judgment of the trial court is affirmed.—Affirmed.

HALE, OLIVER, GARFIELD, WENNERSTRUM, SMITH, MANTZ, and HAYS, JJ., concur.

BLISS, C. J., takes no part.